Present:  All the Justices

WILLIAM N. RANDALL, ET AL.

v.     Record No. 970789     OPINION BY JUSTICE ELIZABETH B. LACY
                              January 9, 1998
LIBERTY MUTUAL INSURANCE COMPANY

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
William F. Rutherford, Judge


In this appeal, we decide whether, for purposes of qualifying as an insured under Code § 38.2-2206, a highway worker was "using" his employer's vehicle while placing lane closure signs along the side of a highway.

Early in the morning of July 28, 1994, James L. Downey and Lawrence Eichler, employees of Archer-Western Contractors, Ltd., were placing lane closure signs along the shoulders of a one-mile section of Interstate 64 in Norfolk when Downey was struck and killed by a car driven by Thomas Glen Pasterczyk.  Downey had driven himself and the closure signs to the highway section in a pickup truck owned by his employer and insured by Liberty Mutual Insurance Company (Liberty).

In placing the closure signs, Downey and Eichler employed the following procedure.  At several points in the one-mile stretch leading to a merge zone, Downey pulled over to the side of the shoulder and exited his vehicle, leaving the engine running and the flashing yellow bubble light on top of the cab turned on.  Downey then removed a stand from the pickup truck and placed it on the side of the road, five to six feet behind the back of the truck.  Next, Downey removed two flags and a sign from the truck and placed those on the stand.  Eichler,

meanwhile, followed the same procedure on the opposite side of the road. Downey and Eichler then would re-enter their trucks and would drive simultaneously to the next designated point.

Downey was struck and killed while placing the fourth and final sign in the one-mile stretch. Eichler testified that Downey had already placed the final stand and retrieved the sign from the back of the truck. Eichler last saw Downey walking away from the truck, toward the stand, carrying the sign. Eichler did not see the actual collision, nor could he say whether Downey had completed placing the final sign on its stand before being struck. Pasterczyk's vehicle drifted off the road, first striking Downey and then striking the truck. According to Eichler, Downey was out of his truck for "two minutes, three minutes, maybe longer" at the fourth spot before the accident occurred, and he was six to ten feet behind the truck on the shoulder of the road at the moment he was hit.

William N. Randall and Sharon S. Downey, Administrators of Downey's estate (collectively "Randall"), filed a motion for judgment against Pasterczyk. Prior to trial, an order was entered by agreement providing, in relevant part, for the entry of a judgment against Pasterczyk in the amount of $105,000, $60,000 of which was to be paid jointly by Pasterczyk's liability insurance carrier and Downey's uninsured/underinsured motorist (UM/UIM) insurance carrier. The order also allowed an amendment to the motion for judgment to seek a determination of whether

2

Downey was an insured under § 38.2-2206 and entitled to underinsured motorist coverage under the Liberty policy.

Following an ore tenus hearing and subsequent argument of counsel, the trial court determined that Randall was not entitled to recover under the UM/UIM endorsement of the Liberty policy because, at the time of his death, Downey was not a named insured under the policy and was neither "using" nor "occupying" the truck. We granted Randall an appeal limited to an assignment of error addressing the issue whether Downey was "operating or using" the truck for purposes of UM/UIM insurance coverage.

I.

Section 38.2-2206 mandates that automobile liability insurance policies provide UM/UIM coverage to persons insured under the policies. The statute defines "insured," in relevant part, as "any person who uses the motor vehicle to which the policy applies" with the consent of the named insured. This mandated coverage is not extended to the entire period of permissive use, but is limited to injuries sustained while the permissive user is actually using the insured vehicle. Insurance Company of North America v. Perry, 204 Va. 833, 837-38, 134 S.E.2d 418, 421 (1964).

Two of our prior cases, Great American Insurance Co. v. Cassell, 239 Va. 421, 389 S.E.2d 476 (1990), and United States Fire Insurance Co. v. Parker, 250 Va. 374, 463 S.E.2d 464 (1995), provide the analytical framework for determining whether a

3

permissive user of an insured vehicle who is injured while away from the vehicle qualifies as an insured and, therefore, is entitled to UM/UIM coverage under § 38.2-2206. In Cassell, a fire fighter was struck by a car while standing 20 to 25 feet from his fire truck. The truck was parked in a manner which restricted traffic flow and provided a protective barrier for the fire fighters, and its red lights were flashing at the time of the accident. The truck was used to transport to the scene water, hoses, tools, and other equipment used in combating the fire. Id. at 422-23, 389 S.E.2d at 476-77. In Cassell, we held that the fire fighter was using his truck at the time of the accident, entitling him to uninsured motorist coverage from the policy insuring the truck. We concluded that "[u]se of the fire truck . . . was an integral part of the fire fighters' mission," and that the fire fighter was "engaged in a transaction essential to the use of the fire truck" when he was struck. Id. at 424, 389 S.E.2d at 477.

In Parker, a landscape gardener drove herself, two other workers, some ornamental cabbage plants, and tools to the entrance of a residential development in a pickup truck. The gardeners parked the truck so as to provide a safety barrier from passing traffic, and began digging holes and planting the cabbages. A door of the truck was left open to allow the gardeners to hear a two-way radio inside the truck. While Parker was digging a hole 12 to 15 feet from the truck, an underinsured

4

motorist hit the truck and then hit Parker, injuring her.  We described the relevant inquiry as whether there was a causal relationship between the accident and the use of the insured vehicle as a vehicle, and concluded that Parker was not using the truck at the time of the accident, since she was not "engaged in a transaction essential to the use of the pickup truck . . . ." 250 Va. at 376-78, 463 S.E.2d at 465-66.

As established by these cases, actual use of the vehicle for purposes of UM/UIM coverage mandated by § 38.2-2206 is not restricted to the transportation function of a vehicle.  If the injured person is using the insured vehicle as a vehicle and as an integral part of his mission when he is injured, he is entitled to UM/UIM coverage under § 38.2-2206.  Parker, 250 Va. at 377-78, 463 S.E.2d at 466; Cassell, 239 Va. at 424, 389 S.E.2d at 477.  In this context, the use of a vehicle "as a vehicle" requires that at the time of the injury, the vehicle is being used in a manner for which it was specifically designed or equipped.[1]  For example, the fire truck in Cassell had special equipment for use in completing the user's fire fighting mission which was in use at the time of the accident.

II.

_____

1  Compare with Lexie v. State Farm Mut. Auto. Ins. Co., 251 Va. 390, 469 S.E.2d 61 (1996), and Travelers Ins. Co. v. LaClair, 250 Va. 368, 463 S.E.2d 461 (1995)(interpreting insurance policies to determine whether parties' injuries resulted from tortfeasors' use of uninsured/underinsured vehicles "as a vehicle").

5

Liberty argues that applying these principles to this case requires the conclusion that Downey was not using his employer's truck when he was struck and killed. Liberty notes that Downey, like the gardener in Parker, was using an ordinary pickup truck to transport items to be deposited at the work site. The truck in Parker was parked in a manner which created a safety zone, but neither that truck nor Downey's impeded or altered the flow of traffic. Finally, Liberty argues, the purpose and use of the yellow warning light on Downey's truck was only to protect the truck by showing the truck's location.[2] Liberty concludes that Downey did not need to use either the truck or its warning light to place the lane closure signs; therefore, as in Parker, when Downey was struck and killed he "was not engaged in a transaction essential to the use of the pickup truck . . . ." 250 Va. at 378, 463 S.E.2d at 466.

We disagree with Liberty. In Parker, we specifically noted that the pickup truck used by the gardeners "had no special, emergency warning lights," and that the positioning of the truck for safety purposes was done "independently and not because of any requirement" of the gardener's employer. 250 Va. at 378, 463 S.E.2d at 466. The lack of these elements contributed to the conclusion that the truck in Parker "merely was used as a means

---

    2 Liberty's counsel stated at oral argument that the location of the truck either in front of Downey or between Downey and the oncoming traffic did not affect whether the purpose and use of the truck was to create a safety zone.

of transportation so that Parker could complete her landscaping duties." Id. However, these elements do exist in this case. Here, the specialized warning equipment and its relationship to Downey's work made the use of the truck more than merely a means of transportation.

Archer-Western Contractors, Ltd., Downey's employer, was doing road work for the Virginia Department of Transportation which required the closing of highway lanes. Closing highway lanes occurs in close proximity to highway traffic, and the need for procedures to insure the safety of workers is inherent in the work. As Downey's co-worker Eichler testified, company procedure for lane closing required Downey to stay close to the truck because when motorists see the lights on the truck, they will think "that . . . people are right back behind the truck." The truck's warning equipment, and the procedures prescribed for putting out the lane closure signs which incorporated the use of the warning equipment, made Downey's truck, like the fire truck in Cassell, a specialized vehicle, one designed to be used for more than simply transportation.

The evidence shows that Downey was following the prescribed safety procedures. When he alighted from the truck, he kept the yellow warning light burning and he remained at a distance from the truck which allowed him enough space to remove the sign from the truck while retaining the protection of the warning light. At the time he was struck, Downey was using the truck's

7

specialized equipment to perform his mission.

Thus, we conclude that Downey qualified as an insured under § 38.2–2206 because he was using his employer's vehicle when he was struck and killed.  Accordingly, we will reverse the judgment of the trial court and remand the case for further proceedings consistent with the views expressed in this opinion.

<u>Reversed and remanded.</u>